UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KRANZ & ASSOCIATES HOLDINGS, LLC,

        Plaintiff,

  v.

KIMBERLY LAIN,

        Defendant.

No. C 23-06005 WHA

**ORDER RE DISCOVERY DISPUTE**

**INTRODUCTION**

In this discovery dispute, the parties dispute two third-party subpoenas directed to corporate entities owned by defendant and her husband. Construing plaintiff's submission as a motion to compel, it is **GRANTS IN PART AND DENIED IN PART**.

**STATEMENT**

Plaintiff-employer Kranz & Associates Holdings, LLC brought suit against defendant Kimberly Lain, a former employee, alleging that the latter "competed against Kranz during her

employment with Kranz and misused Kranz's confidential information both during and after her employment" (Dkt. No. 51 at 2).

Lain was at all relevant times the owner of a corporate entity, Tekvantage, Inc. Her husband, Timothy Dowerty, meanwhile, was the owner of a separate limited liability company, Teknowledgies, LLC. Tekvantage and Teknowledgies are not parties to this litigation. Lain, Dowerty, and their respective corporate entities are represented by the same counsel, who refers to the group as the "Lain Parties." Kranz, Tekvantage, and Teknowledgies appear to provide broadly similar services to a common clientele. The gist of Kranz's theory is that defendant Lain funneled Kranz's confidential information to her and her husband's competing enterprises.

**PROCEDURAL HISTORY**

At issue are two third-party subpoenas duces tecum, the first directed to Tekvantage (Lain's company), the second to Teknowledgies (Dowerty's company). Both were subpoenaed on May 1 (Dkt. No. 43 at 5, 10). Counsel for the Lain Parties lodged their initial responses on May 28 (id. at 15, 20). On September 4, Kranz filed a letter brief alleging that both entities failed to comply with certain document requests made in the respective subpoenas. The Lain Parties lodged a response on September 9. A hearing was held on September 10, during which the undersigned provided a ruling on the Tekvantage subpoena from the bench, and invited further briefing as to the spousal privilege dispute affecting the Teknowledgies subpoena. The parties submitted two further rounds of simultaneous briefing on September 16 and 20. This order follows.

**ANALYSIS**

1. **THE TEKVANTAGE SUBPOENA**

The Court issued an order from the bench as to the Tekvantage subpoena. The parties' post-hearing briefs, however, show that they are in disagreement as to what those orders were

– despite their clarity. In the interest of dispelling any confusion on the part of counsel, this order will provide a summary and restatement of the issues and the undersigned's order.

The following requests for production (RFPs) are at issue:

> **1.** Any and all DOCUMENTS produced, generated or originated between November 20, 2019 and June 20, 2023, including, but not limited to, email, text message and social media communications, exchanged between KIMBERLY LAIN and any TEKVANTAGE, INC. agent employee, former employee, or representative regarding the provision of financial consulting services either for TEKVANTAGE, INC. or any other business entity.
>
> **2.** Any and all DOCUMENTS related to any business offering of TEKVANTAGE, INC. which competes against KRANZ & ASSOCIATES HOLDINGS, LLC, including but not limited to the area of financial consulting services between November 20, 2019 and June 20, 2023.
>
> **6.** Any and all DOCUMENTS which relate any compensation paid to KIMBERLY LAIN between November 20, 2019 and June 20, 2023.

(Dkt. No. 43 at 8-9).

### A.   RFP 1.

Tekvantage's initial response to RFP 1, received on May 28, stated, in relevant part, that "no such documents exist" (Dkt. No. 43 at 16). On July 30, counsel for the Lain Parties again informed Kranz that Tekvantage "will not supplement their response to this request. There are no non-privileged responsive documents to this request" (id. at 41). The Lain Parties' September 16 supplemental brief, meanwhile, stated that "the Lain Parties produced approximately 256 documents responsive to Request 1 . . . Tekvantage has adequately responded to Request 1" (Dkt. No. 50 at 2).

As an initial matter, it is difficult to square Tekvantage's representations to opposing counsel (that no responsive documents exist and none will be produced) with Tekvantage's later representation to the Court (that it has produced 90 or more documents responsive to RFP 1). Both cannot be true. This contradiction came to the fore at the September 10 hearing. Counsel failed to offer any explanation then and has not done so in his subsequent briefing

3

(Dkt. No. 49 at 9). Moreover, it is highly unlikely that Tekvantage has "adequately responded to Request 1" (Dkt. No. 50 at 2).

*First*, Tekvantage confuses RFP 1 and RFP 6 of the Tekvantage subpoena. In its September 16 brief, defense counsel asserted:

> Tekvantage produced no fewer than 90 responsive documents on July 30, 2024. (See Tekvantage Responses attached hereto as "**Exhibit 1**.") Specifically, Tekvantage produced LAIN000862-LAIN00952. Ms. Lain also produced documents LAIN000465-LAIN000466, LAIN000505-LAIN000660, LAIN000830, and LAIN000832-LAIN000841, LAIN000766 – LAIN000767, LAIN000953-LAIN00954, on May 10, 2024, *which are all responsive to Request 1*.

(Dkt. No. 50 at 2). Exhibit 1 is a supplemental response to RFP 6, not RFP 1. The Lain Parties failed to correct that mistake in their September 20 briefing (Dkt. No. 52). This order presumes that the documents Tekvantage identifies as "responsive to Request 1" are instead responsive to RFP 6, if that.

*Second*, the Lain Parties' post-hearing September 16 brief states that "Ms. Lain does not keep paper files and does not use text messaging . . . for business" (Dkt. No. 50 at 1). Kranz has now produced a lengthy series of texts authored by Lain, in which she scheduled business meetings and exchanged business-related information via text, including video captures and screenshots of Excel spreadsheets (Dkt. No. 53-1 at 4 - 30). Lain's texts also contain discussions of contracts, billing rates, monthly billing totals, project management concerns, discussions held with vice presidents of client entities, and so forth (Dkt. No. 53-1 at 23). Defense counsel's assertion that Tekvantage has adequately complied with RFP 1 is suspect to the extent that it is based on a belief that certain categories of documents do not exist.

The two discrepancies above are the subject of a separate order (Dkt. No. 62).

*Third*, the scale of Tekvantage's operation suggests that a production of 90 documents is unlikely to constitute an "adequate response." Kranz's September 4 brief stated that Tekvantage produced a 2020 "Consulting Agreement" between Tekvantage and a third-party client, RS2 (Dkt. No. 43). The consulting agreement, "which Lain signed during her

4

1  employment at Kranz, provided that Tekvantage would provide a variety of accounting service

2  to RS2 and listed *five (5) types of personnel who would support the engagement at billing rates*

3  *ranging from $70 to $125 per hour*" (id. at 2) (emphasis added).  A separate subpoena of RS2

4  produced payment records to Tekvantage of "*approximately $1.4 million dollars* for services

5  between 2021 and 2023" (id. at 2) (emphasis added).  Tekvantage did not challenge Kranz's

6  characterization of the RS2 engagement in its subsequent briefing on September 9, 16, and

7  20.  It stretches credulity that an enterprise operating at a scale sufficient to warrant billing a

8  single client $1.4 million in a two-year span has generated a total of 256 non-privileged

9  documents between its chief executive and her employees concerning the provision of those

10  services.

### B. RFP 2.

Tekvantage's initial response to RFP 2, received on May 28, stated, in relevant part, that "[n]o such documents exist because Respondent does not, and has never, competed against Kranz" (Dkt. No. 43 at 16).  On July 30, counsel for Tekvantage informed Kranz's counsel that Tekvantage "will not supplement their response to this request" because "Tekvantage does not and has never competed against Kranz" (*id*. at 41).

In its September 16 briefing, meanwhile, Tekvantage quibbles with a different issue:  the term "business offering" is not defined, and the Lain Parties "did not solicit business for anyone other than Kranz during the time period Ms. Lain was employed by Kranz.  As a result, no responsive documents exist" (Dkt. No. 50 at 2).

As an initial matter, the request relates to business offerings, not solicitations of specific clients within the relevant period.  Moreover, Tekvantage does not dispute that Lain, in her capacity as chief executive of Tekvantage, signed a "Consulting Agreement" between Tekvantage and a client, RS2, in April 2020 (Dkt. No. 43 at 2).  It is unclear how Tekvantage, an entity that counsel suggests did not provide its own business offerings in the relevant period, managed to pen a consulting agreement with, and bill $1.4 million to, a client in that same time.

Finally, Tekvantage's response to RFP 2 (that it has never competed against Kranz) is improper.  Counsel misunderstands the purpose of discovery.  It is intended to ensure that each

5

party has full view of all relevant, non-privileged documents prior to the submission of argument to the Court, or jury, for adjudication. Counsel's approach is topsy-turvy: he has made a merits determination, and on that basis, refused to produce documents. Counsel for Kranz should likewise avoid such characterizations in his subpoena requests.

## 2. RFP 6.

Plaintiff's September 4 letter asserted that Tekvantage had failed to produce any documents responsive to RFP 6, despite having stated that it would do so on May 28 (Dkt. No. 43 at 2). The Lain Parties' September 9 letter did not address the issue whatsoever, while their September 16 letter asserted that Tekvantage produced "91 documents containing pay stubs from Tekvantage to Ms. Lain," and that Lain herself produced further bank records reflecting those payments, bringing the total number of documents produced up to 143 (Dkt. No. 50 at 3). Kranz's subsequent briefing does not dispute the production of those documents, or the Lain Parties' assertion that they constitute an adequate response to the RFP.

\*     \*     \*

At that hearing, counsel for Tekvantage insisted that "Tekvantage is a very, very small entity," and that "it does not have large staff. It does not have administrative staff . . . it's not a large entity that has well-documented and retained documents. It was *just some people providing some consulting services*" (Dkt. No. 49 at 8). According to counsel, "it's not the kind of organization that created or kept extreme documentation" (*ibid.*). Counsel's representation runs headlong into Tekvantage's relationship with RS2, wherein "Tekvantage provide[d] a variety of accounting service to RS2 and listed *five (5) types of personnel who would support the engagement at billing rates ranging from $70 to $125 per hour*" (Dkt. No. 43 at 2) (emphasis added). That relationship generated billables of "*approximately $1.4 million dollars* for services between 2021 and 2023" (Dkt. No. 43 at 2) (emphasis added).

Counsel is wrong that it "is not incredible that no such documents exist" (Dkt. No. 49 at 8). Either Tekvantage is operating out of a shed, absent records, or it employs five levels of staff who billed a single client $1.4 million over the course of two years. Both cannot be true. Counsel does not challenge the veracity of the latter in its *three* briefs. At oral argument,

6

meanwhile, counsel offered only that the sums billed to RS2 were "not retained by Ms. Lain. It was paid out to other consultants" (Dkt. No. 49 at 8). Were those consultants the aforementioned five levels of personnel employed by Tekvantage? Counsel does not say. Moreover, counsel's argument concedes that this supposed fly-by-night operation funneled client funds *somewhere*, though he cannot say where.

*          *          *

Both sides have expressed confusion as to what was ordered by the Court at the September 10 hearing (Dkt. No. 52). The transcript of the hearing contains a plain statement of the Court's order as to the Tekvantage subpoena. However, in the interest of dispelling counsels' confusion, it is restated here: the Court ordered Tekvantage to make *all* of its employees available for deposition by plaintiffs, immediately (Dkt. No. 49 at 9-10). Should plaintiffs establish, through those depositions or any other means, that Tekvantage has hid the ball, a subsequent hearing will order production and impose appropriate consequences on both Tekvantage and its counsel.

Non-deposition evidence of offending conduct may include, for example, the discovery of relevant text messages despite the Lain Parties' insistence that no text messages exist (see above).

### A.    THE TEKNOWLEDGIES SUBPOENA.

Plaintiffs' subpoena of Teknowledgies, Inc. requested, among other things:

> Any and all DOCUMENTS produced, generated or originated between November 20, 2019 and June 20, 2023, including, but not limited to, email, text message and social media communications, exchanged between KIMBERLY LAIN and any TEKNOWLEDGIES, LLC agent, employee, former employee, or representative regarding the provision of financial consulting services either for TEKNOWLEDGIES, LLC or any other business entity.

(Dkt. No. 43 at 21). On May 28, Teknowledgies objected to the request on the grounds that "it seeks information protected from disclosure by the spousal privilege," while simultaneously

7

asserting that "no such documents exist" (*ibid*.). Counsel for Teknowledgies reiterated that position in a July 30 letter to opposing counsel (*id*. at 40).

California Evidence Code Section 980 provides:

> [A] spouse (or his or her guardian or conservator when he or she has a guardian or conservator), whether or not a party, has a privilege during the marital or domestic partnership relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he or she claims the privilege and the communication was made in confidence between him or her and the other spouse while they were spouses.

Section 917 further explains:

> If a privilege is claimed on the ground that the matter sought to be disclosed is a communication ***made in confidence in the course of the . . . marital or domestic partnership*** . . . the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential."

Cal. Evid. Code § 917(a).

Here, two married individuals own and control two separate legal entities, Tekvantage (Lain) and Teknowledgies (Doherty). Those two commercial entities are in a business relationship independent of the spousal relationship of their owners. The Lain Parties nevertheless claim that Lain's communications with Teknowledgies are shielded *in toto* by the spousal privilege:

> Teknowledgies only has one employee, Mr. Doherty, and Ms. Lain is the owner of Tekvantage. No one other than Ms. Lain and Mr. Doherty had access to their respective email accounts. Further, neither Tekvantage nor Teknowledgies has a company handbook, let alone policies regarding the supervision of said emails. Given that all of the relevant factors support the privilege assertion, the Court should find that Ms. Lain had a reasonable expectation of privacy in the communications in which she has claimed privilege.

(Dkt. No. 50 at 5). Under these conditions, they argue, Lain's communications with Teknowledgies are privileged, top to bottom.

8

The Lain Parties provide no legal authority extending the spousal privilege to that extreme. Nor do the Lain Parties provide any reasonable limitations on their proposed rule. That rule would have myriad perverse consequences, allowing individuals to facilitate expansive business relations between independent legal entities in total darkness. A married couple helming two competing (or cooperating) Fortune 500 companies is free to facilitate a commercial relationship beyond the view of prying eyes (and discovery), defendants argue, so long as the two decline to adopt corporate policies allowing for review of executive communications (and why wouldn't they?). But as the Lain Parties recognize, "[t]he public policy behind Section 980 is aimed at encouraging communication between spouses," not LLCs and general stock corporations (Dkt. No. 52 at 3).

The Lain Parties' rule would also trample over the general principles underpinning California's relational privileges. The spousal privilege "resembles privileges attendant to other confidential relationships, and "for the most part, the same general rules apply across the board to all absolute communications privileges, including spousal, attorney-client, clergy-penitent, and psychotherapist-patent communication privileges." *Doe v. Yim,* 55 Cal.App.5th 573, 587 (Cal. App. 2 Dist., 2020).

"Because privileges prevent the admission of relevant and otherwise admissible evidence, they should be narrowly construed." *People v. Sinohui*, 28 Cal. 4th 205, 212 (2002) (internal quotation marks omitted). The attorney-client privilege, for example, applies only to "confidential communications *within the scope of the attorney-client relationship*." *Roberts v. City of Palmdale*, 5 Cal. 4th 363, 371 (1993) (emphasis added); *Costco Wholesale Corp. v. Superior Ct.*, 47 Cal. 4th 725, 743 (2009) (George, C.J., concurring) ("[T]he Legislature intended to extend the protection of the privilege *solely* to those communications between the lawyer and the client *that are made for the purpose of seeking or delivering the lawyer's legal advice or representation*.") (emphasis added). The penitential privilege applies only to those communications made to a member of the clergy "*who in the course of the discipline or practice of the clergy member's church* . . . is authorized or accustomed to hear those communications." Cal. Evid. Code § 1032 (emphasis added). To claim the psychotherapist-

9

patient privilege, meanwhile, the claimant must establish that they were a "patient," meaning "a person who consulted a psychotherapist or submitted to an examination *for the purpose of securing a diagnosis or preventive, palliative, or curative treatment of his mental or emotional condition*." Cal. Evid. Code § 1011 (emphasis added); *Story v. Superior Ct.*, 109 Cal. App. 4th 1007, 1014 (2003).

None of the above communications privileges capture statements made in the course of a business relationship between an LLC and a general stock corporation that happen to be operated by individuals whose relationship *as individuals* may otherwise give rise to a claim of privilege. The Lain Parties nevertheless argue that the spousal communication privilege does just that. Again, no legal authority is provided for defendants' proposed departure from the general principles that govern California's communications privileges. This very dispute illustrates why. The Lain Parties have asserted the "spousal privilege" over 190 email communications: the subject of *every single communication* is described as "marketing work for the benefit of Kranz" (Dkt. No. 60). That is "the provision of financial consulting services" by ***Teknowledgies***, not spousal communications with ***Doherty***. The communications sought by the May 1 subpoena do not fall within the scope of communications "*made in confidence in the course of the . . . marital or domestic partnership.*" Cal. Evid. Code § 917(a).

Even if those communications *were* privileged, that privilege has been waived.

California Evidence Code Section 912 provides:

> the right of any person to claim [privilege for confidential marital communications] is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege.

Plaintiffs argue that Teknowledgies has already produced several communications between Doherty and Lain subject to the privilege, all concerning "marketing work for the benefit of Kranz" or Lain and Doherty's own enterprises (Dkt. No. 51-1 at 3 – 83). Lain and

10

Doherty do not contest that those communications were disclosed, only that they did not constitute a "significant part" of the communications at issue. Lain and Doherty cannot produce communications regarding their provision of services (for the benefit of Kranz, Tekvantage, Teknowledgies, or some combination thereof) when it suits them, only to invoke the spousal privilege when it does not. They have waived the spousal privilege over communications "regarding the provision of financial consulting services either for TEKNOWLEDGIES, LLC or any other business entity" (Dkt. No. 43 at 21). That waiver includes the 190 email communications identified in the Lain Parties' privilege logs (Dkt. No. 60). The privilege having been waived, Teknowledgies must comply with the request. To be clear: this waiver is narrowly construed, and extends only to those communications between Lain and Teknowledgies concerning the provision of financial consulting services, not any other spousal communication between Lain and Doherty.

The Lain Parties also note that "a waiver of the right of one spouse to claim the privilege does not affect the right of the other spouse to claim the privilege" (Dkt. No. 52 at 4). Teknowledgies produced the documents constituting waiver. Nevertheless, Lain, Doherty, Tekvantage, and Teknowledgies share counsel in this matter. They style themselves as "the Lain Parties" or "the Lain Entities." Lain and Doherty suggest that the two work out of the same home office, elbow-to-elbow. Both had ample opportunity to object to the disclosure of the communications in question.

**CONCLUSION**

As to the Tekvantage subpoena, plaintiffs may take the ordered depositions immediately.

As to the Teknowledgies subpoena, both Lain and Doherty's claim of spousal privilege is overruled. Teknowledgies must produce all relevant documents responsive to the request.

**IT IS SO ORDERED.**

Dated: October 11, 2024

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE