1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6                      SAN FRANCISCO DIVISION

7

8   KRANZ & ASSOCIATES HOLDINGS,          Case No. 23-cv-06005-PHK
    LLC,
9                                          **ORDER GRANTING IN PART**
              Plaintiff/Counter-Defendant, **KRANZ'S MOTION FOR SUMMARY**
10                                         **JUDGMENT; DENYING LAIN'S**
              v.                           **MOTION FOR SUMMARY**
11                                         **JUDGMENT**
    KIMBERLY LAIN,
12                                         Re: Dkts. 76, 77
              Defendant/Counter-Plaintiff.
13  _____
    KIMBERLY LAIN,
14
              Third-Party Plaintiff,
15
              v.
16
    MICHAEL BARRY, *et al.*,
17
              Third-Party Defendants
18  _____

19

20        Now before the Court are the Parties' fully briefed motions for summary judgment.  [Dkts.

21  76-77].  The Parties have consented to proceed before a Magistrate Judge for all purposes,

22  including the entry of final judgment under 28 U.S.C. § 636(c).  [Dkts. 65-66].  After considering

23  the briefs, the evidence submitted, argument and presentations of counsel at the hearing on these

24  motions, and the applicable law, Kranz's motion for summary judgment [Dkt. 76] is **GRANTED**

25  **IN PART and DENIED IN PART**, and Lain's motion for summary judgment [Dkt. 77] is

26  **DENIED**.

27                              **BACKGROUND**

28        Krantz & Associates Holdings, LLC ("Krantz") brings this lawsuit against its former

United States District Court
Northern District of California

1  employee, Kimberly Lain ("Lain"), asserting claims for breach of contract, breach of fiduciary

2  duty, breach of the duty of loyalty, and tortious interference with prospective economic advantage.

3  [Dkt. 1].  Lain has countersued Kranz for violations of Title VII of the Civil Rights Act of 1964,

4  as amended ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the California Fair Employment and

5  Housing Act ("FEHA"), CAL. GOV'T CODE §§ 12940 *et seq..*  [Dkt. 23].  Lain has also filed a third

6  party complaint, asserting similar claims against two Kranz employees, Michael Barry ("Barry")

7  and Daryl Dobrenz ("Dobrenz").  [Dkt. 19].

8  **I.  Material Facts Pertinent to the Resolution of the Motions for Summary Judgment**

9       The following facts are undisputed unless otherwise noted.  Kranz is a consulting firm

10  headquartered in San Francisco, California, that provides financial and accounting services to

11  third-party clients.  [Dkt. 1 at ¶ 1; Dkt. 17 at ¶ 1; Dkt. 76-2 ("Lain Deposition") at 30:6-10].  Lain,

12  an American woman of Japanese descent, worked for Kranz, initially as a consultant and

13  eventually as a Vice President in charge of the firm's NetSuite practice, for roughly six years,

14  from April 24, 2017, until her termination on June 19, 2023.  [Lain Dep. 38:12-40:2; Dkt. 78-9

15  ("Dobrenz Deposition") at 37:1-8.  Dobrenz is Kranz's current CEO.  [Dobrenz Dep. 29:19-21,

16  31:3-6].  Barry is Kranz's CFO.  *Id.* at 31:20-23.

17       Lain's direct supervisor, upon hire, was Kranz's then-CEO, Deborah Kranz.  [Lain Dep.

18  55:21-56:10].  Dobrenz, who succeeded Deborah Kranz as the firm's CEO in 2018, then became

19  Lain's direct supervisor.  [Dobrenz Dep. 30:19-31:2].  Barry eventually became Lain's direct

20  supervisor and Dobrenz became an indirect supervisor.  *Id.* at 31:7-32:3; *see* Dkt. 76-3 ("Barry

21  Deposition") at 45:20-46:5.

22       PIIA Provisions

23       As a condition of her employment with Kranz, Lain signed a Proprietary Information and

24  Inventions Agreement ("PIIA").  [Lain Dep. 46:8-20; *see* Dkt. 76-2 at 33-41].

25       The PIIA contained a confidentiality provision set forth in Paragraph 2, which provided as

26  follows:

27       I agree that all Inventions (as defined in paragraph 6), trade secrets and all other
28       confidential business, technical, and financial information (including, but not

2

limited to, those items listed in Appendix A) I develop, learn, or obtain during my term of employment with [Kranz], that relate to [Kranz], or the business or demonstrably anticipated business of [Kranz], or that are received by or for [Kranz] in confidence, constitute "Proprietary Information."  I will hold in confidence and not disclose or, except within the scope of my employment with [Kranz], use any Proprietary Information.  However, I shall not be obligated under this paragraph, with respect to information which I can document is, or becomes, readily publicly available without restriction through no fault of mine.  Upon termination of my employment with [Kranz], I will promptly return to [Kranz] all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records, (ii) my personnel records, if any, (iii) materials distributed to shareholders or the public generally, and (iv) this Agreement.

[Dkt. 76-2 at 36].

Appendix A of the PIIA defines Proprietary Information to include, among other things, "all information contained in customer/company records."  *Id.* at 39.

The PIIA also included a non-compete provision, set forth in Paragraph 4, pursuant to which Lain agreed to the following:

[D]uring the term of my employment with [Kranz] (whether or not during business hours), I will not engage in any activity for a "business in connection with [Kranz]" or demonstrably anticipated business of [Kranz], and I will not assist any other person or organization in competing or in preparing to compete with a "business in competition with [Kranz]" or demonstrably anticipated business of [Kranz].  For purposes of this paragraph, a "business in competition with [Kranz]" means any person or company in the business of providing financial, administrative, consulting or recruiting support or services to companies or other organizations.

*Id.* at 36.

At the time that Lain was hired by Kranz and at all times relevant to this lawsuit, Lain owned and operated Tekvantage, a business which offers financial and accounting services competitive with those offered by Kranz.  [Lain Dep. 135:10-14].  As of the date that Lain signed the PIIA, Tekvantage was providing consulting services for Kolja Reiss, the current CEO of RS2 Software ("RS2").  *Id.* at 50:20-51:21.  Lain, by her own admission, continued to operate Tekvantage throughout the duration of her employment with Kranz.  *Id.* at 50:8-15, 123:2-17.

There is a factual dispute as to when, if ever, Lain disclosed her ownership and operation of Tekvantage to Kranz.  Lain asserts that she disclosed this information to Kranz's then-CEO,

United States District Court
Northern District of California

1    Deborah Kranz, upon hire.  *Id.* at 50:20-51:11.  Lain asserts that she disclosed the same

2    information to Dobrenz, at some point thereafter.  *Id.* at 52:19-53:8.

3            A little less than five months after starting with Kranz, on September 6, 2017, Lain filed

4    articles of incorporation for Tekvantage with the California Secretary of State.  *Id.* at 108:6-22; *see*

5    bizfile Online, Cal. Sec'y of State, https://bizfileonline.sos.ca.gov/search/business (search for

6    "Tekvantage" or file no. 4062851) (last visited on June 23, 2025); *see also* Fed. R. Evid. 201(b)(2)

7    ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can

8    be accurately and readily determined from sources whose accuracy cannot reasonably be

9    questioned."); *Minor v. FedEx Office & Print Servs.*, 78 F. Supp. 3d 1021, 1028 (N.D. Cal. 2015)

10   (taking judicial notice of record of administrative agencies and publicly accessible websites).  Lain

11   did not disclose the filing of these articles of incorporation to anyone at Kranz.  [Lain Dep. 50:20-

12   53:14].

13           In April 2020, while Lain was working full-time for Kranz, Tekvantage entered into a

14   consulting services agreement with RS2.  *Id.* at 114:5-19; *see* Dkt. 76-2 at 42-49.  Pursuant to the

15   contract terms between Tekvantage and RS2, Tekvantage agreed to provide RS2 with assistance

16   "set[ting] up of Quickbooks Online as the Accounting System and Bill.com" and "[i]ntegrat[ing]

17   Expensify with Quickbooks Online and Bill.com to create higher efficiency," as well as

18   "accounting support to handle all day to day transactions" and monthly "management oversight

19   and reviews as necessary."  [Dkt. 76-2 at 43].  These are services that Kranz offers to clients.

20   [Lain Dep. 56:11-14].

21           Lain did not disclose Tekvantage's potential engagement with RS2 to Kranz prior to

22   Tekvantage's entering into the RS2 consulting services agreement.  *Id.* at 118:22-25.  Lain

23   testified that she provided RS2 with Kranz's standard rates, and when RS2 balked at the stated

24   amount, Lain offered to perform the work via Tekvantage at lower rates.  *Id.* at 118:3-11.  Lain did

25   not offer RS2 the same lower rates via Kranz, even though Kranz has the ability to offer lower

26   rates to rate-sensitive clients or prospective clients.  [Barry Dep. 154:21-155:6].

27           Over the next few years, Lain continued to own and operate Tekvantage, providing

28   services for compensation to RS2 and other third-party clients, while simultaneously employed by

United States District Court
Northern District of California

United States District Court
Northern District of California

Krantz.  [Lain Dep. 113:2-20, 133:10-22].  Tekvantage's RS2 account yielded approximately $1.4 million in revenue over a four-year period; Lain hired as many as eight people to work on that account.  *Id.* at 119:12-120:7.  In February 2021 alone, Lain billed over 115 hours of work to RS2 through Tekvantage.  *Id.* at 133:10-22.  Lain paid herself for the services Tekvantage provided to its clients—in 2021, Lain paid herself $172,276.98 from Tekvantage; in 2022, she paid herself $191,795.80.  *Id.* at 139:21-140:12.  Lain did not disclose this information to anyone at Kranz.  *Id.* at 50:20-53:14.

Meanwhile, Lain's performance of her job with Kranz apparently began to suffer.  In July 2022, Dobrenz notified Lain that one of her clients requested a large credit against its invoices; Kranz ultimately wrote off fifteen percent of the invoice amount.  *Id.* at 170:13-173:9.  In Lain's end of year performance review, dated December 15, 2022, Dobrenz wrote that Lain was "often stretched to manage[] her own clients" and that "there were times when [Lain] was over-worked and the client expectations were not met."  [Dkt. 76-2 at 54-55].  Dobrenz advised that Lain "should provide more direct feedback to subordinates when there are performance issues."  *Id.* at 54.

On February 8, 2023, Lain met with Dobrenz and Barry to discuss her work performance.  [Dobrenz Dep. 68:1-10].  During that meeting, Barry told Lain that she needed to conduct more video conferences with her clients.  [Lain Dep. 178:20-23].  Lain claims that Barry also told her to wear makeup, "appropriate clothing," and "pretty blouses" during her client video calls.  *Id.* at 178:23-179:2.  Barry denies making any comments or directives to Lain regarding her appearance.  [Dkt. 78-11 ("Shah Deposition") at 100:22-101:1, 103:7-16, 106:12-17].

On March 2, 2023, Lain met with Dobrenz regarding an employee under Lain's supervision who had recently resigned.  [Dobrenz Dep. 70:4-18, 79:4-19; *see* Dkt. 76-4 at 14-15].  During that meeting, Dobrenz told Lain that he felt that she was insubordinate in her interactions with Barry and others.  [Dobrenz Dep. 76:10-20].  Dobrenz told Lain to come up with a "get-well plan" outlining how her work performance would improve over the next thirty to ninety days.  *Id.* at 81:9-15.  At one point during the meeting, Dobrenz raised his voice with Lain.  *Id.* at 86:25-87:6.  Dobrenz told Lain that she needed to "know [her] own place."  [Dkt. 76-6 at 12].  The

5

interaction made Lain feel like Dobrenz wanted her to behave like a "good, quiet little Asian girl."

[Dkt. 84-14 at 1].  As of the conclusion of this meeting, Dobrenz had not yet decided to terminate

Lain's employment.  [Dobrenz Dep. 78:6-9].

Later that evening, at 12:52 a.m., Lain sent an email to Kranz's Senior Human Resources

Director, Shawna Shah ("Shah"), in which she lodged a complaint regarding Dobrenz's and

Barry's workplace behavior.  [Shah Dep. 70:1-71:8; *see* Dkt. 76-6 at 9-10].  The email read, in

relevant part, as follows:

> I'm writing to you because a) I am very upset and b) because I feel that I can
> confide in you since we have had interactions in the past.
>
> Earlier today I had a one on one with Daryl Dobrenz, the CEO of Kranz, and it
> was one of the most humiliating, hurtful experiences of my career, and I wanted
> to talk to you about it.  In the meeting today, Daryl was scolding me for things
> that, in my view, were not my fault, and was doing so in a harsh tone and in a very
> loud manner.  He seemed quite angry with me.
>
> When I would try to speak up, he would quickly shut me down.  I honestly felt
> like he wanted me to be a good, quiet little Asian girl, and just do as he was
> demanding.
>
> This pattern was repeated earlier by Michael Barry, Kranz CFO and Emerging
> Growth Practice Leader, who basically did the same thing to me.  He was totally
> disrespectful, telling me rude, biting, and blaming slurs, without any regard to my
> feelings or to my input.  I am not sure why I am being ganged up upon; I feel like
> I am under attack.
>
> * * *
>
> I don't want to go into too many details in this email but would rather talk over
> the phone.  I've also documented my situation in a ten-plus page document that
> I'd be happy to share with you at some point.
>
> I am very upset about this.
>
> I look forward to your response and recommendation on next steps.  I must ask
> that you keep this confidential and if it is disclosed to any of Kranz management,
> that I am immediately informed.

[Dkt. 76-6 at 9-10].

On March 6, 2023, Lain met with Shah over Zoom to discuss the contents of her email.

[Shah Dep. 84:4-85:15].  Shah began the call by stressing to Lain that Kranz maintained a strict

anti-retaliation policy.  [Dkt. 76-6 at 11].  During the call, Lain complained that Dobrenz and

Barry had both been pressuring her to conduct more video conferences with her clients, instructing her to wear makeup and "nice clothes" for the video calls. *Id.* at 11-12. Lain told Shah that she believed Dobrenz and Barry were making these "rude and negative" comments because she was a woman. *Id.* at 12. Lain complained that Barry and Dobrenz were both "ganging up" on her "about everything." *Id.* She told Shah that Dobrenz recently "blew up" in a meeting, during which he "yell[ed]" at her "very loudly" and told her that she "should know [her] place." *Id.*

After speaking with Lain, Shah interviewed Dobrenz and Barry as part of her investigation into Lain's allegations. [Dobrenz Dep. 87:7-25; Barry Dep. 139:14-20]. At the time that Shah interviewed Dobrenz, he was aware of Lain's complaint against him. [Dobrenz Dep. 24:25-25:3].

On March 20, 2023, Shah concluded her investigation and notified Lain that she could find no evidence to support an actionable claim of discrimination, harassment, or hostile work environment. [Dkt. 76-6 at 17-18; Dkt. 84-7 at 2].

One day later, on March 21, 2023, Dobrenz and Shah spoke on the phone regarding the results of the investigation. [Dkt. 84-7 at 2; *see* Shah Dep. 228:23-230:18]. During that call, Dobrenz and Shah discussed the propriety of taking adverse employment action against Lain. *Id.* Shah cautioned Dobrenz against doing so, stressing that "that would be retaliation." [Shah Dep. 229:1-6]. In an email to himself memorializing the conversation with Shah, Dobrenz wrote that Shah "[r]ecommends not taking any adverse actions at the moment. 3-4 weeks from now, we can put her on a PIP." [Dkt. 84-7 at 2]. Dobrenz further wrote that "S[hah] says that if I want to cut ties sooner rather than later, she will talk to Peg about how to do this legally." *Id.*

Meanwhile, in early March 2023, the Silicon Valley Bank collapsed, leading many of Kranz's clients to scale back their use of Kranz services. [Dobrenz Dep. 95:11-21]. Due to this slowdown, Kranz made the decision to terminate the NetSuite line of services and transition that work to a sister company. *Id.* at 96:3-13. At some point thereafter, between March 3, 2023 and June 19, 2023, Dobrenz made the decision to eliminate Lain's position, citing the deterioration of the overall market conditions and Lain's poor work performance. *Id.* at 78:6-9, 119:23-120:2, 121:16-23, 122:8-14. Dobrenz testified that any issues with Lain's work performance predated March 21, 2023. *Id.* at 122:16-24.

United States District Court
Northern District of California

1     On April 18, 2023, Barry sent an email to Lain, stating that he wanted to check in with her

2 to ensure that she was "operating at the right level" and managing her time "at the right quantity."

3 [Dkt. 76-2 at 62].  In one portion of that email to Lain, Barry recounted a complaint that he had

4 recently received from one of Lain's clients, stating as follows:

> JD from Ridecell called me on Friday to discuss the status of his engagement.  He
> feels that what Kranz is delivering is "monkey see, monkey do" (not his words,
> to be fair), but we are not adding a layer of diligence or QA to what he is giving
> us.  I know this may be news to you but we need to be proactive on how we are
> managing this client.

9 *Id.*

10    Lain responded to Barry's email later that same day, stating, among other things, that the

11 "monkey see, monkey do" comment was "just a flat-out insult."  *Id.* at 61-62.  The next day, Lain

12 sent an email to Shah, attaching her correspondence with Barry, and stating as follows:

> I know you don't seem to see anything wrong with your management staff.  But,
> your leadership needs some counseling about using microaggressions in the
> workplace.  I received the email below from Michael Barry from [sic] which I
> told him was insulting.  Michael Barry continues to conduct himself in an
> unprofessiona[l] way and communicates in an unconstructive manner with
> assumptions, lack of guidance, and demeaning insults to try to break down and
> diminish the appearance of my capacity.
>
> I am disconsolate from the constant sexism and racism and frankly abuse that
> comes from Kranz management.  To tell me, a Japanese-American – my mother
> survived the Japanese internment camps in WWII – that I am a "monkey see
> monkey do", is an outrage.  (See his email below.)
>
> I've been putting up with this type of racist ignorance since I was in grade school
> and I thought that, once I reached adulthood that it would stop.  I also thought
> that, as a modern society, we had learned that this type of language and behavior
> has no place in the workplace.  Apparently, Michael disagrees and believes that
> racism and sexism are a way to motivate employees.
>
> As I'm sure that you are aware, Americans have compared Japanese people to
> monkeys for decades.
>
>                          * * *
>
> To me, it is unbelievable that Michael would continue to show his bias against me
> – especially in lieu [sic] of my recent complaints to you and HR against this type
> of behavior!

United States District Court
Northern District of California

This comment is in line with other common offensive comments that a person would make such as "Indian giver" or "We got gypped". He has not said these statements – these are examples of other microaggressive comments that are similar that one would say in the workplace to offend and would not be acceptable to say to anyone.

This is very serious. We need to discuss this immediately as this needs to stop.

*Id.* at 61.

On May 31, 2023, during a meeting that included Shah, Dobrenz, and Barry, discussion turned to Lain's work performance. [Dkt. 78-6 at 2-4]. Referencing Lain's recent complaint against him, Dobrenz at one point commented, "You can't have a relationship with someone when others have been wronged." *Id.* at 3. Notes from the meeting appear to suggest that Dobrenz was weighing the pros and cons of firing Lain, at one point remarking, "Steve Kwon has been [Lain's] right-hand person. He's pretty independent . . . he wants to learn more about NetSuite. Could there be collateral damage, but honestly, I think it's a minimal risk." *Id.* at 3-4.

On June 7, 2023, Lain formally accepted an offer of employment with a direct competitor company called Launch (which somewhat confusingly was founded by Deborah Kranz, the former CEO and namesake of Kranz & Associates). [Lain Dep. 216:8-21, 217:4-6]. Lain did not disclose her acceptance of the offer to Kranz and continued to work for Kranz until she was fired twelve days later. *Id.* at 216:8-21.

On June 19, 2023, Kranz terminated Lain's employment. [Dobrenz Dep. 119:2-20]. The decision to fire Lain was made by Dobrenz alone. *Id.* at 120:25-121:2]. Lain was the only employee let go as part of Kranz's reorganization efforts. *Id.* at 126:23-127:1. Lain's subordinate, Steve Kwon, remained in his position with Kranz. *Id.* at 124:9-20, 125:2-4. At the time that Dobrenz made the decision to fire Lain, he did not consider firing Kwon. *Id.* at 126:5-7.

Within hours of her termination from Kranz, Lain sent her new employer, Launch, copies of Kranz's financial agreements with Kranz's customers, Knightscope and Xpansiv, as well as Xpansiv's customer list, and "general information" needed to prepare contracts with those entities. [Lain Dep. 205:15-206:11, 207:5-208:15]. The financial agreements that Lain provided to Launch were given to Lain by the clients themselves. *Id.* at 206:6-19, 208:8-12. There is a factual dispute

United States District Court
Northern District of California

1    as to whether these documents constitute Proprietary Information under the PIIA.

2    The Parties have offered competing evidence as to whether Lain solicited business from

3    Knightscope and Xpansiv on behalf of Launch prior to her termination from Kranz.  Lain testified

4    that she reached out to Knightscope and Xpansiv regarding moving their business to Launch only

5    after she was fired.  *Id.* at 207:3-8, 211:19-212:8, 212:18-213:14.  Both Knightscope and Xpansiv

6    eventually left Kranz and transitioned their accounts to Launch.  *Id.* at 211:19-22, 212:18-215:21.

7    **II.  Procedural History**

8    Following these events, on November 20, 2023, Krantz commenced this lawsuit against

9    Lain, asserting four claims for relief: (1) Breach of Contract—Non-Compete Provision; (2) Breach

10   of Contract—Confidentiality Provision; (3) Breach of Fiduciary Duty/Duty of Loyalty; and (4)

11   Tortious Interference with Prospective Economic Advantage.  [Dkt. 1 at ¶¶ 7-54].

12   On February 20, 2024, Lain filed charges of discrimination with the California Civil Rights

13   Department and the Equal Opportunity Commission.  *See* Dkts. 23-1, 23-2.  After receiving notice

14   of her right to sue from those agencies, Lain filed counterclaims against Kranz, as well as third-

15   party claims against Barry and Dobrenz.  As against Kranz, Lain asserts twelve counterclaims for

16   relief: (1) FEHA Sex Harassment; (2) Title VII Sex Harassment; (3) FEHA Race Harassment; (4)

17   Title VII Race Harassment; (5) FEHA Sex Discrimination; (6) Title VII Sex Discrimination; (7)

18   FEHA Race Discrimination; (8) Title VII Race Discrimination; (9) Wrongful Termination in

19   Violation of Public Policy; (10) FEHA Retaliation; (11) Title VII Retaliation; and (12) Failure to

20   Prevent Harassment, Discrimination, and Retaliation.  [Dkt. 23 at ¶¶ 23-121].  As against Dobrenz

21   and Barry, Lain asserts seven identical claims for relief: (1) FEHA Sex Harassment; (2) FEHA

22   Race Harassment; (3) FEHA Sex Discrimination; (4) FEHA Race Discrimination; (5) Wrongful

23   Termination in Violation of Public Policy; (6) FEHA Retaliation; and (7) Failure to Prevent

24   Harassment, Discrimination, and Retaliation.  [Dkt. 19 at ¶¶ 25-79].

25   At the close of discovery, the Parties filed competing motions for partial summary

26   judgment.  Kranz moves for summary judgment as to Lain's liability on all four of its claims.

27   [Dkt. 76 at 2].  In addition, Kranz, Dobrenz, and Barry collectively move for summary judgment

28   as to the entirety of Lain's counterclaims and third-party claims for discrimination and harassment.

1  *Id.* at 2-3.  Finally, Lain moves for summary judgment as to Kranz's and Dobrenz's liability on

2  her retaliation claims.  [Dkt. 77 at 21].

3  <u>**LEGAL STANDARDS**</u>

4       Summary judgment is appropriate if "the movant shows that there is no genuine dispute as

5  to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

6  56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial

7  burden of demonstrating the absence of genuine issues of material fact.  *Celotex*, 477 U.S. at 325.

8  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate

9  that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty*

10  *Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear

11  the burden of proof at trial, the moving party can prevail merely by "pointing out" that there is an

12  absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325.

13       Once the moving party meets this burden, the burden shifts to the nonmoving party to

14  demonstrate a genuine issue for trial on a material matter.  *Id.* at 324.  The nonmoving party may

15  not rest solely on the allegations in the pleadings, but instead, must designate "specific facts

16  showing that there is a genuine issue for trial."  *Id.*; *see also* Fed. R. Civ. P. 56(c).  "[A] party

17  cannot manufacture a genuine issue of material fact merely by making assertions in its legal

18  memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde &*

19  *Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

20       "[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine

21  the truth of the matter but to determine whether there is a genuine issue for trial.'  *Tolan v. Cotton*,

22  572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

23  Whether there is a genuine dispute as to a material fact depends upon "whether the evidence

24  presents a sufficient disagreement to require submission to a jury," or conversely, whether the

25  evidence "is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at

26  251-52.  A disputed fact is "material" where the resolution of that fact might affect the outcome of

27  the suit under the governing law.  *Id.* at 248.  A dispute is "genuine" if "the evidence is such that a

28  reasonable jury could return a verdict for the nonmoving party."  *Id.*  "Where the record taken as a

United States District Court
Northern District of California

11

1  whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue

2  for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing

3  *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

4       In evaluating a motion for summary judgment, a court may consider admissible evidence

5  only. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see* Fed. R. Civ. P. 56(e).

6  The factual record and reasonable inferences therefrom are viewed in the light most favorable to

7  the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 377 (2007).  However, this

8  standard does not require the Court to make "unreasonable inferences from circumstantial

9  evidence" in favor of the nonmoving party. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir.

10  1988).

**ANALYSIS**

11

12  **I.  Kranz Motion for Summary Judgment as to its Claims Against Lain**

13       Kranz's complaint alleges four claims against Lain: (1) Breach of Contract—Non-Compete

14  Provision; (2) Breach of Contract—Confidentiality Provision; (3) Breach of Fiduciary Duty/Duty

15  of Loyalty; and (4) Tortious Interference with Prospective Economic Advantage.  [Dkt. 1 at ¶¶ 7-

16  54].  Kranz moves for summary judgment in its favor as to liability on all four claims.  [Dkt. 76 at

17  2].

18       **A.  Breach of Contract Claims**

19       Kranz seeks summary adjudication on the issue of liability for its claims for breach of the

20  PIIA's non-competition clause and confidentiality clause.  *Id.* at 18-21.

21       In California, the required elements of a breach of contract cause of action are: "(1) the

22  existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

23  defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty LLC v.

24  Goldman*, 250 P.3d 1115, 1121 (Cal. 2011).

25       Here, the uncontroverted record shows that Lain signed the PIIA, as a condition of her

26  employment with Kranz, on April 11, 2017.  [Lain Dep. 46:8-20; Dkt. 76-2 at 36-38].  It is

27  undisputed that Kranz performed its obligations under the PIIA by paying Lain the promised cash

28  consideration required by her employment agreement and by thereafter providing Lain all

12

United States District Court
Northern District of California

compensation and benefits specified under the employment contract.  *See* Dkt. 76-7.

### 1. Breach of Non-Compete Clause

Kranz seeks summary judgment as to breach of the non-compete clause set forth in Paragraph 4 of the PIIA.  Paragraph 4 of the PIIA provides:

> [D]uring the term of my employment with [Kranz] (whether or not during business hours), I will not engage in any activity for a "business in connection with [Kranz]" or demonstrably anticipated business of [Kranz], and I will not assist any other person or organization in competing or in preparing to compete with a "business in competition with [Kranz]" or demonstrably anticipated business of [Kranz].  For purposes of this paragraph, a "business in competition with [Kranz]" means any person or company in the business of providing financial, administrative, consulting or recruiting support or services to companies or other organizations.

[Dkt. 76-2 at 36].

As an initial matter, Lain cursorily argues that the PIIA's non-compete provision is void as a matter of public policy under California law, as well as "contradicted" by Kranz's own employee handbook.  [Dkt. 83 at 11].  The Court finds both of these arguments to be without merit.

First, citing *Kelton v. Stravinski*, 138 Cal. App. 4th 941 (Cal. Ct. App. 2006), Lain argues that Paragraph 4 of the PIIA is a "quintessential example" of the type of non-compete provision that violates public policy, because the provision "seeks to hamper open competition."  *Id.*

It is true that California "has a settled public policy in favor of open competition" such that the "general rule is that covenants not to compete are void."  *Kelton*, 138 Cal. App. 4th at 946 (citing *Hill Med. Corp. v. Wycoff*, 86 Cal. App. 4th 895, 900-01 (Cal. Ct. App. 2001)).  However, it is also true that California law "does not authorize an employee to transfer [their] loyalty to a competitor" *during* the term of their employment. *Samuelian v. Life Generations Healthcare, LLC*, 104 Cal. App. 5th 331, 355 (Cal. Ct. App. 2024) (quoting *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 509 (Cal. Ct. App. 2013)).

The non-compete provision at issue here, by its terms, binds Lain only from

United States District Court
Northern District of California

competing with Kranz *during* the term of her employment with Kranz. The provision does not limit or otherwise attempt to restrict Lain's post-employment competition. Accordingly, the Court finds that Paragraph 4 of the PIIA does not violate California public policy. *See W. Air Charter, Inc. v. Schembari*, No. EDCV 17-420 JGB (KSx), 2018 WL 10157139, at *11 (C.D. Cal. Nov. 21, 2018) (rejecting employee's argument that non-compete provision violated public policy and holding that the agreement was enforceable in so far as it prohibited the employee from transferring loyalty to a competitor while employed by their current employee).

Lain next argues that the PIIA's non-compete provision is "contradicted" by Kranz's employee handbook. [Dkt. 83 at 11]. Lain points to a provision of the employee handbook that authorizes Kranz employees to "hold a job with another organization[.]" [Dkt. 84-13 at 17]. However, as Lain conceded at the motion hearing, the complete clause in the employee handbook requires more than simply holding a job with another organization—in full, the handbook states: "You may hold a job with another organization so long as you satisfactorily perform your job responsibilities with [Kranz] and have the approval of your manager." *Id.* Read in full, this portion of the employee handbook does not contradict the PIIA.

Kranz argues that the undisputed material facts establish that Lain breached the PIIA's non-compete provision in two ways: (1) by "forming Tekvantage to provide financial and accounting services, the same services provided by Kranz, and hiring up to 8 employees to deliver in excess of $1.4M in billing for RS2 while employed by Kranz;" and (2) by "accepting employment with direct competitor Launch Finance while employed by Kranz, thus 'engaging in activity for a business in competition' with Kranz, then sharing documents with Launch to help them take Knightscope and Xpansiv from Kranz." [Dkt. 76 at 20 (alterations omitted)].

Lain argues that there is a genuine issue of material fact as to whether she competed against Kranz during her employment. [Dkt. 83 at 12]. First, as to Tekvantage, Lain proffers evidence to show that, around the time that she was first hired

1    by Kranz, she disclosed both her ownership and operation of Tekvantage and her

2    preexisting relationship with RS2's CEO, Kolja Reiss, to Kranz's then-CEO, Deborah

3    Kranz.  [Lain Dep. 50:20-51:11, 52:19-53:8].  Lain testified that, at the time that she was

4    hired by Kranz, she informed Deborah Kranz that she was currently providing consulting

5    services to Kolja Reiss.  *Id.*  Lain testified that she disclosed this same information to

6    Dobrenz as well.  *Id.* at 52:19-53:8.  At the motion hearing, Lain's counsel pointed to the

7    fact that the Kranz employee handbook has no requirement for obtaining renewed or

8    repeated managerial approval, and on that basis, argued that there is a genuine factual

9    dispute as to whether the conversations Lain had with Deborah Kranz and Dobrenz

10   qualified as managerial approval under the employee handbook.

11           To the extent that Kranz argues that Lain breached the non-compete clause by

12   accepting employment with competitor Launch, Kranz's motion for summary judgment

13   fails as a matter of law.  Specifically, a contract clause which seeks to prohibit an

14   employee from seeking other employment before resigning is void under § 16600 of the

15   California Business & Professions Code.  *Spanish Broad. Sys., Inc. v. Grupo Radio*

16   *Centro LA, LLC*, No. CV 16-00980-BRO (GJSx), 2016 WL 11741137, at *4 (C.D. Cal.

17   May 23, 2016).  Section 16600 states, in relevant part, that "every contract by which

18   anyone is restrained from engaging in a lawful profession, trade, or business of any kind

19   is to that extent void."  Cal. Bus. & Prof. Code § 16600.  In *Spanish Broadcasting*, the

20   employer alleged a breach of an "employee fidelity" clause in an employment agreement,

21   where that clause prohibited the employee "from initiating or inviting contact with, or

22   soliciting or entertaining offers or proposals of, employment from [the employer's]

23   competitors during his employment."  2016 WL 11741137, at *4.   The *Spanish*

24   *Broadcasting* court held that the "employee fidelity" clause "broadly prohibited [the

25   employee] from even entertaining an offer or proposal of employment from a competing

26   employer.  Such a restriction is overly broad and an unlawful restraint of trade in

27   violation of section 16600. Accordingly, the Court concludes that the employee fidelity

28   clause is void under California law."  *Id.* (citations omitted).  Accordingly, Kranz is not

1    entitled to summary judgment for breach of the PIIA's non-compete clause based on

2    Lain's acceptance of employment from Launch, as a matter of law.

3         With regard to the disclosure of information about Kranz's customers

4    Knightscope and Xpansiv, Kranz argues Lain's disclosure to Launch of the retainer

5    agreements those customers had with Kranz and the billing amounts from each client is a

6    breach of the non-compete clause in the PIIA.  [Dkt. 76 at 20].  However, Lain testified

7    that, hours after she was terminated from Kranz, she obtained the retainer agreements and

8    billings, not from Kranz, but instead, directly from Knightscope and Xpansiv.  [Lain Dep.

9    206:6-19, 208:8-12].  Lain argues that the voluntary disclosure to her of that information

10   from these customers was not a breach of the non-compete provision, because those

11   customers are free to share their own documents and information without restriction by

12   Kranz.  Because evaluating credibility is not appropriate in the context of a summary

13   judgment motion, and drawing all reasonable inferences in Lain's favor, the Court finds

14   that there is a triable issue of fact both as to the source of these materials, and the timing

15   of when Lain obtained them.

16        On this record, then, Kranz has not met its burden to affirmatively demonstrate

17   the absence of a genuine issue of material fact as to whether Lain breached the PIIA's

18   non-compete provision.  For that reason, Kranz's motion for summary judgment as to this

19   claim is **DENIED**.

20                    **2.  Breach of Confidentiality Clause**

21        Kranz also seeks summary adjudication as to the issue of liability with regard to the

22   asserted cause of action that Lain breached the confidentiality provision set forth in Paragraph 2 of

23   the PIIA.  [Dkt. 76 at 20].  Paragraph 2 of the PIIA provides that both during and after

24   employment with Kranz, Lain would not "disclose or, except within the scope of [her]

25   employment with [Kranz], use any Proprietary Information."  [Dkt. 76-2 at 36].  The PIIA defines

26   Proprietary Information to include "all information contained in customer/company records."  *Id.*

27   at 36, 39.

28        The operative facts here are essentially the same as with the non-compete cause of action

1  discussed above: Kranz argues that Lain breached the confidentiality provisions "by sharing Kranz

2  Proprietary Information with Launch Finance, specifically Kranz's contracts with Knightscope

3  and Xpansiv and the amount of billings for each client."  [Dkt. 76 at 20].

4          Lain argues that there is a genuine issue of material fact as to whether she provided any

5  materials constituting Proprietary Information under the PIIA to Launch.  [Dkt. 83 at 13].  As

6  discussed above, Lain testified that the retainer agreements and billing information that she

7  provided to Launch were given to her directly by Xpansiv and Knightscope, and that these

8  materials were provided to Lain shortly after she was terminated from Kranz.  [Lain Dep. 207:3-8,

9  211:19-212:8, 212:18-213:14].  Lain testified that any other information that she provided to

10 Launch was merely "general information."  *Id.* at 207:16-208:9.  On this basis, Lain argues that

11 the documents and information at issue did not originate from Kranz's records, but instead were

12 the property of those customers—who were free to give them to Lain, and that any other

13 information that she provided to Launch was "general information" outside the purview of the

14 PIIA's confidentiality clause.  [Dkt. 83 at 13].  Kranz, for its part, has produced no evidence

15 showing a contractual or legal basis to control the dissemination of documents and information

16 when in the hands of Knightscope or Xpansiv.

17         At the motion hearing, Kranz argued that the source of the documents at issue is, at best,

18 unclear, pointing to other portions of Lain's testimony where she wavered as to whether she

19 obtained them from Kranz itself.  *See* Lain Dep. 210:14-211:3 ("Q: Are you sure you didn't get

20 those documents from Kranz? . . . THE WITNESS: I don't know. . . . Q: You might have gotten

21 them from Kranz, correct? . . . A: I don't recall.").  This testimony is not, on its face, an express

22 admission by Lain that she did not know the source of the documents, particularly in light of her

23 more specific testimony earlier in her deposition (relied on by Lain in opposing summary

24 judgment).  Kranz's argument on this issue is puzzling because, as the moving party on an issue

25 for which it bears the burden of proof at trial, Kranz appears to have attempted to raise questions

26 of fact on this issue by admitting and arguing that the source of the documents was "unclear" and

27 "just unknown exactly."

28         In the briefing, Kranz further argues that Lain's knowledge of the existence of the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   customer relationships with Knightscope and Xpansiv and her knowledge of their billing records

2   is information that she acquired from Kranz during the scope of her employment, and thus,

3   whether she ultimately obtained the documents from the customers is irrelevant.  [Dkt. 76 at 20].

4   Kranz argues that Lain used her knowledge about these customers as the basis to seek the

5   materials at issue from Knightscope and Xpansive, and her use of that knowledge constituted a

6   breach of the confidentiality clause, which by its terms continued to apply after her termination.

7   [Dkt. 85 at 9].  Lain argues that California law allows a terminated employee to contact a former

8   customer, and thus, if that customer voluntarily decides to provide documents or materials to that

9   former employee, there can be no breach of the confidentiality clause.

10       The Court notes that Lain's testimony as to Knightscope and Xpansiv being the source of

11   the materials at issue that she provided to Launch is somewhat equivocal.  As represented at the

12   hearing on this motion, neither party took discovery from Knightscope or Xpansiv to attempt to

13   either corroborate or dispute Lain's testimony.  A party opposing summary judgment cannot

14   attempt to manufacture a factual dispute by providing their own self-contradictory testimony.

15   *Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009).  Here, however, Lain did not retract or

16   disavow her prior testimony that the customers were the source of the documents at issue; as

17   discussed above, the testimony apparently relied on by Kranz for this issue does not directly

18   contradict Lain's prior testimony (although her responses certainly do not appear to support her

19   counsel's arguments on the merits).  Again, evaluating credibility is not appropriate at the

20   summary judgment stage.  *Anderson*, 477 U.S. at 255.  While a closer call, ultimately, the Court is

21   guided by the legal requirement to draw all reasonable inferences in non-movant Lain's favor.

22   *Scott*, 550 U.S. at 377.  In light of applicable legal standards, the Court finds that there exists a

23   material factual dispute as to the source of the documents and information regarding Knightscope

24   and Xpansiv that Lain provided to Launch.  Further, the Court finds that Kranz has not shown that

25   the fact that Knightscope and Xpansiv were customers of Kranz was Proprietary Information

26   within the meaning of Paragraph 2 of the PIIA—and thus, Kranz's assertion that Lain used that

27   information or knowledge to contact those customers after she was terminated is not a sufficiently

28   supported basis on which to grant summary judgment.

1    Accordingly, Kranz's motion for summary judgment on the issue of liability for the cause

2    of action asserting breach of the confidentiality clause in the PIIA is **DENIED**.

3    **B.  Breach of Fiduciary Duty/Duty of Loyalty**

4    Kranz's third cause of action against Lain is styled confusingly as both "breach of

5    fiduciary duty/duty of loyalty." [Dkt. 1 at 9].  Under California law, breach of a fiduciary duty

6    and breach of a duty of loyalty are two distinct causes of action.  *See E.D.C. Techs., Inc. v. Seidel*,

7    216 F. Supp. 3d 1012, 1016 (N.D. Cal. 2016).  Here, Kranz asserts both causes of action, alleging

8    that Lain "undertook fiduciary duties and duties of loyalty to Kranz" and further alleging that

9    Kranz breached her fiduciary duties and duties of loyalty "[b]y competing with Kranz while

10   employed by Kranz."  [Dkt. 1 at ¶¶ 41, 44].

11   **1.  Breach of Fiduciary Duty**

12   Under California law, "[t]he elements of a cause of action for breach of fiduciary duty are:

13   (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately

14   caused by that breach."  *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 646 (Cal. Ct. App. 2018)

15   (citation omitted).

16   Here, Kranz moves for summary judgment on its breach of fiduciary duty claim.  [Dkt. 76

17   at 21].  With regard to the first element of this cause of action, Kranz argues that Lain owed

18   fiduciary duties to Kranz by virtue of the employee/employer relationship.  *Id.*  Confusingly (and

19   contrary to California law), Kranz also argues that a fiduciary duty "includes" the duty of loyalty

20   that an employee owes to an employer.  *Id.*  In its reply brief, Kranz concedes that the duty of

21   loyalty is distinct from a fiduciary duty under California law.  [Dkt. 85 at 14].

22   Fundamentally, Kranz's argument is that Lain's position with Kranz is sufficient to show

23   that she was a fiduciary of the company, though it candidly admits that whether someone is a

24   fiduciary is a question of fact.  *Id.* at 15.  Here, Kranz points to evidence that Lain "managed

25   clients," that she "managed Kranz's Netsuite practice and supervised employees engaged in that

26   practice," and that she was "empowered to grow it."  *Id.*

27   Lain argues that Kranz has failed to meet its summary judgment burden as to whether she

28   was a fiduciary, because the record is devoid of evidence that Lain "was anything more than an

United States District Court
Northern District of California

19

employee." [Dkt. 83 at 17]. It is undisputed that Lain was never an officer or a member of the board of directors of Kranz.

"There are two kinds of fiduciary duties—those imposed by law and those undertaken by agreement." *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 416 (Cal. Ct. App. 2000)) (citations omitted), *overruled on other grounds by Reeves v. Hanlon*, 95 P.3d 513 (Cal. 2004). "Fiduciary duties are imposed by law in certain technical, legal relationships such as those between partners or joint venturers, husbands and wives, guardians and wards, trustees and beneficiaries, principals and agents, and attorneys and clients." *Id.* Kranz cites no controlling law (and the Court has found none) holding broadly that all employees (including lower-level employees) owe a fiduciary duty to their employer. *See O'Byrne v. Santa Monica-UCLA Med. Ctr.*, 94 Cal. App. 4th 797, 811 (Cal. Ct. App. 2001) ("Plaintiff cites no cases holding that a hospital has a fiduciary relationship with its staff members. In general, employment-type relationships are not fiduciary relationships."); *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 129 (Cal. Ct. App. 1966) ("Under prevailing judicial opinion no presumption of a confidential relationship arises from the bare fact that parties to a contract are employer and employee; rather, additional ties must be brought out in order to create the presumption of a confidential relationship between the two."); *see also Albert Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 479 n.2 (N.D. Cal. 2020).

As Kranz itself admits, the existence of a fiduciary relationship is a factual matter which depends on the circumstances of the case, such as the person's position, role, duties, and scope of authority within a company, and does not rise or fall merely on titles. *See GAB*, 83 Cal. App. 4th at 420-21 ("[A]n officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law. Conversely, a 'nominal' officer with no management authority is not a fiduciary. Whether a particular officer participates in management is a question of fact.").

Here, Kranz's admissions doom its motion for summary judgment on its fiduciary duty claim. As noted, it is undisputed that Lain held no position which gives rise to a fiduciary duty as a matter of law. And Kranz does not rely on any contract which allegedly imposed by its terms a

fiduciary duty on Lain with regard to Kranz.  Further, Kranz has presented no evidence to show the scope of authority, duties, role, or other aspects of Lain's position which would be sufficient to transform her status from a mere employee to a fiduciary of the company.  All of the factors pointed to by Kranz are merely conditions and terms of Lain's employment—and as noted, Kranz has cited no California law supporting the conclusion that employees, simply by virtue of their employment, have fiduciary relationships with their employers.

On the record presented to the Court, Kranz's motion for summary judgment on its breach of fiduciary duty claim is **DENIED**.

### 2. Breach of the Duty of Loyalty

The elements of a cause of action for breach of the duty of loyalty are: "(1) the existence of a relationship giving rise to a duty of loyalty; (2) one or more breaches of that duty; and (3) damage proximately caused by that breach." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (Cal. Ct. App. 2007) (citation omitted).  "During the term of employment, an employer is entitled to its employees' 'undivided loyalty.'" *Samuelian*, 104 Cal. App. 5th at 355 (citation omitted). "The duty of loyalty is breached, and may give rise to a cause of action in the employer, when the employee takes action which is inimical to the best interests of the employer." *Stokes v. Dole Nut Co.*, 41 Cal. App. 4th 285, 295 (Cal. Ct. App. 1995).

In its briefing, Kranz argues that Lain, by virtue of the employee/employer relationship, owed Kranz a duty of "undivided loyalty."  [Dkt. 76 at 21].  Kranz argues that Lain breached her duty of loyalty, first, "by forming and operating her own competing business, offering the same services as Kranz, during her employment with Kranz," and second, "by accepting employment with Launch and diverting Knightscope and Xpansiv away from Kranz, while she was employed by Kranz." *Id.* at 22.  Fundamentally, then, Kranz's breach of the duty of loyalty claim is based on the same operative facts which underlie its claim for breach of the non-compete clause in the PIIA.

In light of the overlap in the factual predicate for this cause of action and the non-compete cause of action, it is no surprise that Lain's opposition to summary judgment is similar to her opposition as to the breach of the non-compete clause claim.  As discussed above, Lain testified that, around the time that she was hired by Kranz, she disclosed to Deborah Kranz her ownership

and operation of Tekvantage, and then later disclosed this same information to Dobrenz.  Lain thus argues that there can be no breach of the duty of loyalty, given that she provided notice to Kranz and Kranz essentially acquiesced in her work with Tekvantage.  With regard to Lain's employment and disclosure of information to Launch, as discussed above, Lain testified that she did not solicit business from Knightscope or Xpansiv on behalf of Launch until after she was terminated from Kranz, that she obtained the documents and information directly from those customers (and not from Kranz's files), and that her acceptance of employment with Launch is legally permissible under California law.

For much of the same reasoning why summary judgment is not appropriate on Kranz's claim for breach of the non-compete clause, here—and certainly when viewing the factual record in the light most favorable to Lain and drawing all reasonable inferences in her favor—the Court finds that there are genuine issues of material fact as to whether Lain breached a duty of loyalty to Kranz.  Accordingly, the Court **DENIES** Kranz's motion for summary judgment on its claim for breach of the duty of loyalty.

### D.  Tortious Interference with Prospective Economic Relations

Under California law, "[t]he tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship."  *N. Am. Chem. Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 786 (Cal. Ct. App. 1997); *see also Chung v. Intellect Soft Grp. Corp.*, No. 21-cv-03074-JST, 2022 WL 20184655, at *8 (N.D. Cal. July 13, 2022).

Kranz moves for summary judgment on its claim for tortious interference with prospective

economic relations.  [Dkt. 76 at 22].   Here, Kranz has produced evidence showing that it had

economic relationships with Knightscope and Xpansiv, with the probability of future economic

benefit to Kranz; that Lain knew about these relationships; that Lain actually disrupted these

relationships by soliciting Knightscope and Xpansiv to move their business from Kranz to Launch;

that Lain's actions directly caused Knightscope and Xpansiv to terminate their contracts with

Kranz; and that Kranz suffered resulting economic harm.  Again, similar to the discussion with

regard to the breach of the duty of loyalty claim above, the same operative facts which underlie

Kranz's breach of the non-compete cause claim also underlie Kranz's negligent interference

claim.

It is thus no surprise that Lain's opposition to Kranz's summary judgment motion for this

cause of action is similar to the opposition to the breach of the non-compete clause claim.  As

detailed above, Lain argues that her post-termination communications with Knightscope and

Xpansiv were permissible under California law and that Knightscope and Xpansiv shifted their

business to Launch because of actions Kranz itself took, rather than because of Lain.  Specifically,

Lain argues that Knightscope moved its business to Launch because Kranz terminated her and she

was integral to Knightscope's team, and that Xpansiv ultimately ceased work with Kranz because

Barry was disrespectful and unprofessional with Xpansiv.  [Dkt. 83 at 14-15].

The Court further notes that the overlap between Kranz's breach of the non-compete

provision claim with this negligent interference claim is legal grounds to deny summary judgment.

As discussed in *Chung*, a cause of action for interfering with a prospective economic advantage is

subject to dismissal if it is duplicative of a breach of contract claim where the allegations

supporting both are co-extensive: "[I]t can be said that any impact on the plaintiffs' prospective

economic relationships caused by the actions that led to the breach of contract 'were simply

consequences of breach of contract' as opposed to being the result of the defendant 'having the

improper malicious purpose to destroy appellant' business[.]'  However, a claim for interference

with prospective economic advantage is *not* barred on the basis that it is duplicative of a breach of

contract claim where the interference claim is premised on 'separate, tortious conduct such as

lying, meddling, slandering, and threatening litigation[.]'"  *Chung*, 2022 WL 20184655, at *11

United States District Court
Northern District of California

1    (citation omitted; emphasis in original).  Here, any impact on Kranz's prospective economic

2    relationships with Knightscope and Xpansiv resulting from Lain's alleged breach of the non-

3    compete clause were simply consequences of that alleged breach of the non-compete clause, and

4    Kranz has not alleged the existence of a separate, independently wrongful or tortious act to support

5    its negligent interference claim.  As such, summary judgment in Kranz's favor on the negligent

6    interference claim is not appropriate.

7        For these reasons, the Court finds that there are both legal impediments to and genuine

8    issues of material fact with respect to the cause of action for negligent interference with

9    prospective economic advantage.  Accordingly, the Court **DENIES** Kranz's motion for summary

10   judgment on this claim.

## II.   Kranz's and Third-Party Defendants' Motion for Summary Judgment on Lain's Discrimination and Harassment Claims

13       Kranz, Dobrenz, and Barry collectively move for summary judgment on Lain's

14   discrimination and harassment claims.  [Dkt. 76 at 2-3].

### A.  Discrimination Claims

16       Lain asserts sex-based and race-based discrimination claims under FEHA and Title VII.

17       Title VII makes it unlawful for an employer to discriminate against an employee because

18   of her sex or race.  42 U.S.C. § 2000e-2(a)(1).  FEHA likewise makes it unlawful for an employer

19   to "discriminate against [a] person in compensation or in terms, conditions, or privileges of

20   employment" because of a person's sex or race.  CAL. GOV'T CODE § 12940(a).

21       California has adopted the same standards applicable to Title VII cases when considering

22   discrimination claims brought under FEHA.  *See Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1113

23   (Cal. 2000) ("Because of the similarity between state and federal employment discrimination laws,

24   California courts look to pertinent federal precedent when applying our own statutes."); *see also*

25   *Ambat v. City & Cnty. of S.F.*, 757 F.3d 1017, 1023 n.2 (9th Cir. 2014) ("FEHA is interpreted

26   consistently with Title VII.").  The Court therefore analyzes Lain's Title VII and FEHA

27   discrimination claims together.  *See Hittle v. City of Stockton, Cal.*, 101 F.4th 1000, 1011 (9th Cir.

28   2024) ("We analyze employment discrimination claims under Title VII and California's FEHA

1   using the *McDonnell Douglas Corp. v. Green* burden-shifting test."); *see also Frohm v. Cuty &*

2   *Cnty. of S.F.*, No. 22-cv-06002-JST, 2025 WL 1397203, at *2 (N.D. Cal. May 14, 2025)

3   (analyzing Title VII and FEHA claims together).

4          Discrimination claims can be established by direct or circumstantial evidence.  *Opara v.*

5   *Yellen*, 57 F.4th 709, 722 (9th Cir. 2023).  A plaintiff may elect to prove their case under the

6   *McDonnel-Douglas* burden-shifting framework.  Under this framework, a plaintiff has the initial

7   burden of proving a *prima facie* case of discrimination.  *Lui v. DeJoy*, 129 F.4th 770, 776 (9th Cir.

8   2025).  If a plaintiff does so, the burden then shifts to the employer to articulate a legitimate, non-

9   discriminatory reason for the adverse employment action.  *Id.*  Once such a showing has been

10  made, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a

11  pretext for the alleged discrimination.  *Id.*

12         At the first stage of the burden-shifting framework, to establish a *prima facie* case of sex-

13  based or race-based discrimination, a plaintiff must show that: (1) they belong to a protected class;

14  (2) they were qualified for the position; (3) they were subjected to an adverse employment action;

15  and (4) the adverse action "occurred under circumstances giving rise to an inference of

16  discrimination." *Id.* at 777-78 (alteration omitted).  "At summary judgment, the degree of proof

17  necessary to establish a [*prima facie*] case is 'minimal and does not even need to rise to the level

18  of a preponderance of the evidence.'"  *Damiano v. Grants Pass Sch. Dist. No. 7*, --- F.4th ----,

19  2025 WL 1691987, at *27 (9th Cir. 2025) (quoting *Lyons v. England*, 307 F.3d 1092, 1112 (9th

20  Cir. 2002)).

21         Here, Kranz does not dispute, for purposes of the summary judgment analysis, that Lain

22  has satisfied the first and third elements of her *prima facie* cases of sex-based and race-based

23  discrimination.  *See* Dkt. 76 at 25-30.  As to the first element, it is undisputed that Lain is a female

24  and of Japanese descent.  As to the third element, there is no dispute that Lain was terminated by

25  Kranz on June 19, 2023.

26         Kranz focuses its summary judgment arguments on the second and fourth elements of the

27  *prima facie* case.  As to the second element, Kranz argues that Lain was not performing her job in

28  a satisfactory manner such that she was qualified for the position, and, as to the fourth element,

United States District Court
Northern District of California

Kranz argues that there was no discriminatory motive for her termination. *Id.* at 26-27.

As to the second element of the *prima facie* case analysis, Lain has presented evidence indicating that her most recent written performance evaluation prior to termination included scores which Dobrenz himself considered positive scores and a sign of good performance. [Dobrenz Dep. 65:12-14]. Lain also relies on her employee self-assessment that she performed as an "outstanding/role model" while working at Kranz. [Dkt. 84-15]. Viewing the evidence in the light most favorable to Lain and drawing all reasonable inferences in her favor, the Court finds that there are genuine issues of material fact as to whether Lain was performing her job adequately at the time that she was terminated.

In many if not most employment discrimination cases, the critical *prima facie* inquiry is whether the employee has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination. An "inference of discrimination" can be established either via the *McDonnell Douglas* framework or through direct or circumstantial evidence of discriminatory intent. *Vasquez v. City & Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2003). An "inference of discrimination" can be established by showing, for example, that "similarly situated individuals outside the protected class were treated more favorably," or that the position previously occupied by the complaining employee was filled by another person outside of the protected class. *Lui,* 129 F.4th at 777-78. Direct evidence of discriminatory intent is that which, if believed, proves the fact of discriminatory animus without inference or presumption. *Opara*, 57 F.4th at 722; *see, e.g.*, *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) ("Cordova has offered direct evidence of discriminatory animus: Raker's alleged comments that Maldonado was a 'dumb Mexican' and that he was hired because he was a minority."). Circumstantial evidence of discriminatory intent, on the other hand, is that which relies on some inferential leap to establish discriminatory animus and requires that the employee show a "nexus" between the circumstantial evidence and the adverse employment action. *Vasquez,* 349 F.3d at 640 (citing *DeHorney v. Bank of Am. Nat'l Trust & Savings Assoc.*, 879 F.2d 459, 468 (9th Cir. 1989)). "Under any approach, generally, 'very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive.'" *Opara*, 57 F.4th at

United States District Court
Northern District of California

723-24 (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004)) (alteration omitted). However, an employee asserting discrimination claims at all times retains the ultimate burden of persuading the trier of fact that the employer's contested action was due either in whole or in part to discriminatory intent. *Id.* (citation cleaned up).

Here, the Parties dispute whether Kranz is entitled to summary judgment on this fourth element of the *prima facie* inquiry. In opposing summary judgment, Lain argues that she can establish the fourth element of her *prima facie* case based on direct evidence of comments by Barry, her direct supervisor. [Dkt. 83 at 22]. The Ninth Circuit has held that "[d]erogatory comments made by a decisionmaker" can constitute direct evidence of discriminatory animus which "can create an inference of discriminatory motive." *Hittle*, 101 F.4th at 1013 (citation omitted). Lain argues that Barry made "criticisms" directed to her that "were based on her sex and race." [Dkt. 83 at 22]. Specifically, she points to Barry's comments during her February 8, 2023 performance review that she wear makeup and more colorful blouses while on Zoom calls with clients, arguing that "[t]hese criticisms are clearly based on her sex as a woman, which directly implicates a motive to terminate [her]." *Id.* (citing Lain Dep. 178:20-179:3). Lain also relies on Barry's "monkey see monkey do" comment discussed above, arguing that Barry effectively "made reference to [her] as a monkey, which is a racial slur for people of Japanese origin," and further arguing that the comment constitutes "evidence of Kranz's discriminatory motive for terminating [her]." *Id.* (citing Lain Dep. 178:20-179:5, 197:22-198:14).

A fundamental defect in Lain's argument is that whether Barry made these comments is, on the record presented, unrelated to the decision to terminate her employment. The uncontroverted record shows that Dobrenz, alone, made the decision to terminate Lain; there is no evidence suggesting that Barry was involved in that decision. *Hittle*, 101 F.4th at 1013 (finding no direct evidence of animus where discriminatory remarks were attributed to a non-decisionmaker employee); *Vasquez*, 349 F.3d at 640 (same). Lain proffers no evidence of discriminatory remarks made by Dobrenz.

To the extent that Lain relies on Barry's comments as circumstantial evidence of discriminatory animus, she has failed to identify any competent evidence reasonably suggesting a

nexus between Barry's comments and the decision to terminate her employment. *Cf. Nesbit v. PepsiCo. Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding supervisor's comment—"[w]e don't necessarily like grey hair"—to be insufficient circumstantial evidence of age discrimination, where the comment was not tied directly to the employee's termination); *see also Hittle*, 101 F.4th at 1016 ("On summary judgment, circumstantial evidence of discrimination must be specific and substantial.") (internal quotation marks omitted).  Other than the fact that Barry was her supervisor and also worked with Dobrenz, Lain presents no evidence to link anything Barry said or did in the months prior to her termination to Dobrenz's decision to terminate her.  The Court finds that Barry's comments—whether considered separately or taken as a whole—do not create a genuine dispute of material fact as to the issue of, and are insufficient circumstantial evidence of, discriminatory animus.

Finally, while not explicitly argued by Lain in her briefing, Lain appears to predicate some aspect of her discrimination claims on a theory that she was treated less favorably than similarly situated employees, in particular Steve Kwon.  However, Lain has failed to present any evidence regarding whether the comparator employee was in fact "similarly situated," for purposes of Title VII.  At best, the record indicates that Kwon worked under Lain on Netsuite issues and that he was not terminated when Kranz was reorganized, but aside from that, there is no indication of Kwon's actual job duties and responsibilities, and thus, insufficient evidence in the record to create a triable issue of fact as to whether he was similarly situated with respect to Lain.  *See Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 1004 (9th Cir. 2019) ("It is not enough for employees to be in similar employment positions; rather, the plaintiff and the comparator employee must be 'similarly situated . . . in all materials respects.'  Employees are similarly situated if they have 'similar jobs and display similar conduct.'  Here, Weil failed to produce evidence of a similarly situated employee who displayed similar conduct.  Although Weil introduced evidence that no white female directors were placed on PIPs or terminated during the relevant management period, Weil did not introduce evidence that any of those employees failed to meet deadlines and complete tasks or had steadily declining performance reviews.") (internal citations omitted).  Moreover, there is no evidence in the record showing that Kwon even falls outside of Lain's

1    protected class.

2    Accordingly, based on the record presented to the Court, Lain has failed to demonstrate a

3    genuine issue of material fact on whether she was terminated under circumstances giving rise to an

4    inference of discrimination.  On that basis, therefore, Lain has failed to present sufficient evidence

5    to avoid summary judgment on the issue of whether she has established a *prima facie* case of sex

6    or race discrimination under Title VII or FEHA.  Accordingly, the Court **GRANTS** Kranz's and

7    the Third-Party Defendants' motion for summary judgment on Lain's discrimination claims.

8    **B.  Harassment Claims**

9    Title VII's prohibition of discrimination based on sex or race "encompasses the creation of

10   a hostile work environment, which violates Title VII's guarantee of 'the right to work in an

11   environment free from discriminatory intimidation, ridicule, and insult.'"  *McGinest*, 360 F.3d at

12   1112 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)); *see also Woods v.*

13   *Graphic Commc'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991) ("Courts have long recognized that a

14   workplace in which racial hostility is pervasive constitutes a form of discrimination.").  FEHA

15   likewise makes it unlawful for an employer "to harass an employee" because of sex or race.  CAL.

16   GOV. CODE § 12940(j)(1).  The elements of a harassment claim under FEHA track the elements of

17   such a claim under Title VII.  *See Lyle v. Warner Bros. Television Prods.*, 132 P.3d 211, 220 (Cal.

18   2006) ("California courts have adopted the same standard for hostile work environment sexual

19   harassment claims under the FEHA.").  The Court therefore analyzes Lain's Title VII and FEHA

20   harassment claims together.

21   To prevail on a sex harassment claim, an employee must prove the following elements: (1)

22   that they were "subjected to verbal or physical conduct of a sexual nature[;]" (2) that "this conduct

23   was unwelcome[;]" and (3) that the conduct was "sufficiently severe or pervasive to alter the

24   conditions of the victim's employment and create an abusive working environment."  *Fuller v.*

25   *Idaho Dep't of Corrs.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Fuller v. City of Oakland*, 47

26   F.3d 1522, 1527 (9th Cir. 1995)).  "'The working environment must both subjectively and

27   objectively be perceived as abusive,' and the objective analysis is done 'from the perspective of a

28   reasonable' woman."  *Id.* (citation omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787

United States District Court
Northern District of California

29

1    (1998) ("[A] sexually objectionable environment must be both objectively and subjectively

2    offensive, one that a reasonable person would find hostile or abusive, and one that the victim in

3    fact did perceive to be so.").

4         To prevail on a race harassment claim, an employee must demonstrate: (1) that there were

5    "subjected to verbal or physical conduct of a racial nature; (2) that the conduct was unwelcome;

6    and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the

7    [employee]'s employment and create an abusive work environment." *Reynaga v. Roseburg Forest*

8    *Prods.*, 847 F.3d 678, 686 (9th Cir. 2017) (quoting *Vasquez*, 349 F.3d at 642) (alterations

9    omitted).  The employee must show that the work environment was both subjectively and

10   objectively hostile; the objective analysis is done from the perspective of a reasonable person

11   belonging to the employee's racial or ethnic group.  *Id.* at 687 (citations omitted).

12        Kranz seeks summary judgment on Lain's harassment claims, arguing that she has failed to

13   adduce sufficient evidence showing "severe or pervasive" harassment.  [Dkt. 76 at 23].  In

14   determining whether a work environment was infused with actionable levels of hostility, the Court

15   must evaluate the totality of the circumstances, "including the 'frequency of the discriminatory

16   conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

17   utterance; and whether it unreasonably interferes with an employee's work performance[.]'"

18   *Mattioda v. Nelson*, 98 F.4th 1164, 1176 (9th Cir. 2024) (quoting *Faragher*, 524 U.S. at 787-88).

19   "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with

20   the pervasiveness or frequency of the conduct."  *Id.* at 1175-76 (quoting *EEOC v. Nat'l Educ.*

21   *Ass'n, Alaska*, 422 F.3d 840, 847 (9th Cir. 2005)).  "'[S]imple teasing, offhand comments, and

22   isolated incidents (unless extremely serious)' are not sufficient to create an actionable claim under

23   Title VII, but the harassment need not be so severe as to cause diagnosed psychological injury."

24   *Reynaga*, 847 F.3d at 687 (quoting *Faragher*, 524 U.S. at 788).

25        In opposing summary judgment on her sexual harassment claims, Lain references: (1)

26   Barry's comments that she wear makeup and colorful blouses during Zoom calls with clients; and

27   (2) the incident where Dobrenz raised his voice to Lain and told her that she needed to "know

28   [her] place."  [Dkt. 83 at 20 (citing Lain Dep. 178:20-179:3; Dobrenz Dep. 76:10-12, 86:25-

United States District Court
Northern District of California

87:6)].  Lain's evidence supporting her sexual harassment claims amounts to two incidents—one in which she was yelled at and told to "know [her] place, and one in which her supervisor told her to wear makeup and colorful blouses on client Zoom calls—spanning a two-month period out of the roughly six years that Lain was employed by Kranz.  Even viewing the incidents in the light most favorable to Lain, these two episodes are insufficiently severe or pervasive to have caused a reasonable woman in Lain's position to have considered the terms and conditions of her employment to have been altered.  *See Vasquez*, 349 F.3d at 642-44 (holding that "[t]wo isolated remarks," two incidents of yelling, and a couple of false complaints about the plaintiff were not sufficiently severe or pervasive conduct to survive summary judgment on a hostile work environment claim); *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1019-20 (9th Cir. 2018) (finding supervisor's chiding of the plaintiff "for 'ragging' at students and staff," which the plaintiff argued was a veiled reference to her menstrual cycle, to be an isolated remark that was insufficient to show severe or pervasive sex-based harassment); *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 998 (9th Cir. 2010) ("A violation is not established merely by evidence showing sporadic use of abusive language, gender-related jokes, and occasional teasing.").  None of the alleged conduct here involved physical touching, explicitly sexualized comments or behavior, or lengthy and sustained periods of harassment.  *Cf. Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105-06 (9th Cir. 1998) (finding a genuine issue of material fact as to severity and pervasiveness of sexual harassment, where the plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her "gorgeous" and "beautiful" rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes); *see also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1085-87, 1096 (9th Cir. 2008) (finding a triable issue of fact as to whether the conduct alleged by a female employee—including being told that she could work for a different supervisor because he "needed a girlfriend," being told "[w]e don't mind if female employees are working as long as they don't complain," and being told "the donuts are for the guys"— was severe or pervasive, though noting that it was a "close[] question" given that the "incidents f[ell] far short of physical abuse or aggressive sexual advances").  The Court finds that

1    the evidence presented by Lain regarding these incidents, viewed in their totality and construed in

2    the light most favorable to Lain as the non-moving party, fails to create a genuine issue of material

3    fact as to whether Lain was subjected to sufficiently severe or pervasive conduct to support a sex-

4    based harassment claim.

5         In opposing summary judgment on her race-based harassment claims, Lain relies on

6    Barry's "monkey see monkey do" comment, detailed above, as well as her own subjective belief

7    that Dobrenz wanted her to behave like a "good, quiet little Asian girl."  [Dkt. 83 at 20-21].

8         First, Lain's belief that Dobrenz wanted her to behave like a "good, quiet little Asian girl,"

9    without evidence supporting that belief, is insufficient to create a triable issue of fact.  *See Carmen*

10   *v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a

11   defendant acted from an unlawful motive, without evidence supporting that belief, is no more than

12   speculation or unfounded accusation about whether the defendant really did act from an unlawful

13   motive.").  Thus, the "monkey see monkey do" comment is the *sole* evidence proffered by Lain in

14   support of her race harassment claim.  One isolated comment is by definition not pervasive, and a

15   single stray comment such as this is not sufficiently severe to create an objectively hostile or

16   abusive work environment.  *See Fried v. Wynn Las Vegas, LLC*, 18 F.4th 643, 648 (9th Cir. 2021)

17   (A single incident of harassment can support a hostile work environment claim, but for a single

18   incident to suffice, it must be "extremely severe."); *Tatum v. Davita Healthcare Partners, Inc.*,

19   790 F. App'x 58, 59-60 (9th Cir. 2019) (holding coworkers' conduct, including singing "We are

20   the world" song, while offensive, generally fell into the category of offhand comments that were

21   not sufficiently severe or pervasive to create an abusive working environment); *Vasquez*, 349 F.3d

22   at 642-44 (holding that "[t]wo isolated remarks," two incidents of yelling, and a couple of false

23   complaints about the plaintiff were not sufficiently severe conduct to survive summary judgment

24   on a hostile work environment claim).  Accordingly, construing the evidence in the light most

25   favorable to Lain, the Court finds that Lain fails to raise a triable issue of fact as to whether she

26   was subjected to sufficiently severe or pervasive conduct to support a claim for race-based

27   harassment.

28        In sum, then, Lain has failed to demonstrate a genuine issue of material fact regarding the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    severity or pervasiveness prong of her harassment claims.  Accordingly, the Court **GRANTS**

2    Kranz's and the Third-Party Defendants' collective motion for summary judgment as to all of

3    Lain's harassment claims.

4    **III.  Lain's Motion for Summary Judgment on Retaliation Claims**

5            Lain does not seek summary judgment to narrow or eliminate any of Kranz's claims, but

6    similar to Kranz's tactical approach, Lain seeks summary judgment on the issue of liability in her

7    favor for her retaliation claims against Kranz and Dobrenz.  [Dkt. 77 at 9-15].  At the motion

8    hearing, Lain confirmed that she does not seek summary judgment with respect to her retaliation

9    claim against Barry.

10           Title VII makes it unlawful "for an employer to discriminate against [an employee] . . .

11   because [the employee] has opposed any practice made an unlawful employment practice by [Title

12   VII]."  42 U.S.C. § 2000e-3(a).  FEHA has an identical provision.  CAL. GOV'T CODE § 12940(h).

13   "Title VII retaliation claims use the same burden-shifting *McDonnell Douglas* framework used for

14   discrimination claims."  *Lui*, 129 F.4th at 782 (citing *Dawson v. Entek Int'l*, 630 F.3d 928, 936

15   (9th Cir. 2011)).  As with the discrimination and harassment claims discussed above, retaliation

16   claims under Title VII and FEHA are therefore analyzed together.  *See Adetuyi v. City & Cnty. of*

17   *S.F.*, 63 F. Supp. 3d 1073, 1092 (N.D. Cal. 2014) ("[A]s the Court has determined Adetuyi cannot

18   support claims of . . . retaliation under Title VII, his FEHA claims fail for the same reasons.").

19           To establish a *prima facie* case of retaliation, a plaintiff must establish the following: (1)

20   engagement in a protected activity; (2) an adverse employment action; and (3) a causal connection

21   between the protected activity and the adverse employment action.  *Lui*, 129 F.4th at 782 (quoting

22   *Surrell v. Cal. Water Servs. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)).

23           Here, Lain has presented sufficient evidence to meet her initial burden (for purposes of

24   summary judgment) to establish a *prima facie* case of retaliation.  Specifically, Lain presented

25   evidence that she filed a formal employee complaint against Dobrenz and Barry with the

26   appropriate HR personnel within Kranz, in which she reported the conversation with Barry

27   regarding her makeup and clothing, as discussed above, as well as the conversation with Dobrenz

28   in which he raised his voice, as also discussed above.  [Dkt. 77 at 8, 16].  Further, as discussed

1  above, it is undisputed that Lain was subject to an adverse employment action when she was

2  terminated.  Finally, Lain has presented sufficient evidence to show a causal connection between

3  the protected activity and the adverse employment action.  Specifically, Lain has presented

4  evidence that Dobrenz, who undisputably made the decision to terminate Lain's employment, was

5  aware of Lain's HR complaint against him and Barry; that he was aware of her job performance

6  prior to her lodging her complaint (but did not consider terminating her for poor job performance

7  at that earlier time); and that he made the decision to fire Lain only after she filed her complaint.

8  [Dkt. 77 at 16-17].  In addition, Lain points to the close temporal proximity between her making

9  the HR complaint (*i.e.,* the protected activity) and her termination (*i.e.,* the adverse employment

10  action), which occurred three months after the completion of the internal HR investigation into her

11  complaint.  *Id.* at 17.  Accordingly, Lain has met her initial burden to demonstrate a *prima facie*

12  case of retaliation for purposes of summary judgment.

13         Because Lain has met her *prima facie* burden, under the *McDonnell-Douglas* framework,

14  the burden shifts to Kranz to come forward with evidence showing a legitimate, non-

15  discriminatory motive for its actions.  *Lui*, 129 F.4th at 776.  The employer's burden at this stage

16  is one of production, not of persuasion; it need only proffer non-discriminatory reasons, not prove

17  them.  *Opara*, 57 F.4th at 723.

18         Here, Kranz has presented evidence that the decision to fire Lain was due to the

19  deterioration in the overall market stemming from the March 2023 collapse of Silicon Valley

20  Bank, as well as due to concerns over Lain's poor work performance which predated her HR

21  complaint.  [Dkt. 82 at 9-10 (citing Dobrenz Dep. 95:11-21, 96:3-13)].  Kranz has thus met its

22  burden to demonstrate the existence of legitimate, non-discriminatory reasons for the adverse

23  employment action.

24         Because Kranz has met its burden of production as to the reasons for the termination,

25  under the *McDonnell-Douglas* analytical framework, the burden shifts back to Lain to establish

26  that Kranz's proffered reason is a pretext for unlawful discrimination.  *Lui*, 129 F.4th at 776.  At

27  the pretext stage, the employee must offer "specific and significantly probative evidence"

28  demonstrating pretext; it is not enough to simply reiterate the *prima facie* case and deny the

United States District Court
Northern District of California

34

1    credibility of the employer's evidence.  *Schuler v. Chronicle Broad. Co.*, 793 F.2d 1010, 1011 (9th

2    Cir. 1986).  A plaintiff can establish that the proffered reason for the adverse employment action is

3    pretextual either (1) directly by persuading the court that a discriminatory reason more likely

4    motivated the employer or (2) indirectly by showing that the employer's proffered explanation is

5    unworthy of credence.  *MacIntyre v. Carroll College*, 48 F.4th 950, 954 (9th Cir. 2022) (quoting

6    *Emeldi v. Univ. of Ore.*, 673 F.3d 1218, 1224 (9th Cir. 2012)).

7         Here, on the issue of pretext, Lain relies on evidence (including Dobrenz's notes of a

8    conversation with Shah, Shah's notes of a later conversation with Dobrenz, as well as testimony

9    from both) that Dobrenz was "highly agitated" that Lain made a complaint about him; that

10   Dobrenz raised the issue of "cutting ties with" Lain "sooner rather than later" with Shah shortly

11   after Lain made the HR complaint; that Shah told Dobrenz that taking adverse action against Lain

12   for making the HR complaint would constitute retaliation; and that Dobrenz stated (in connection

13   with Lain) that "[y]ou can't have a relationship with someone when others have been wronged."

14   [Dkt. 77 at 8-14].

15        Kranz, in response, argues that the evidence cited by Lain establishes, on its face, that Shah

16   told Dobrenz that retaliation was not permitted.  [Dkt. 82 at 15].  Kranz argues that an HR

17   professional's counseling of a corporate manager regarding their legal obligation not to retaliate is

18   an insufficient basis to find pretext as a matter of law, contending that Lain, as the moving party,

19   is improperly requesting that the Court make inferences in her favor here.  Kranz argues that there

20   is a genuine factual dispute as to whether the collapse of Silicon Valley Bank led to the decision

21   by Kranz to reorganize its Netsuite practice and eliminate Lain's position, as well as whether this

22   proffered reason for her termination is pretextual.  *Id.* at 13.  Kranz also argues that the chronology

23   of the decision to terminate Lain is subject to genuine dispute because Dobrenz was never asked at

24   deposition when he first considered terminating Lain; rather, he was asked only whether he was

25   "prepared" to terminate her prior to her filing the HR complaint.  *Id.*

26        At this final step of the *McDonnell Douglas* analytical framework, viewing all of the

27   evidence in the light most favorable to Kranz and drawing all inferences in Kranz's favor, the

28   Court finds that there is a triable issue of fact as to whether Kranz's proffered justification for

United States District Court
Northern District of California

terminating Lain was a pretext for unlawful retaliation. Accordingly, for the reasons discussed herein the Court **DENIES** Lain's motion for summary judgment on her retaliation claims.

<u>**CONCLUSION**</u>

Accordingly, **IT IS ORDERED THAT:**

1. Kranz's motion for summary judgment as to its claims for breach of contract, breach of fiduciary duty, breach of the duty of loyalty, and tortious interference with prospective economic advantage [Dkt. 76 at 2] is **DENIED**.

2. Kranz's motion for summary judgment as to Lain's counterclaims for FEHA sex harassment, Title VII sex harassment, FEHA race harassment, Title VII race harassment, FEHA sex discrimination, Title VII sex discrimination, FEHA race discrimination, and Title VII race discrimination [Dkt. 76 at 2-3] is **GRANTED**.

3. Dobrenz's and Barry's motion for summary judgment as to Lain's third-party claims for FEHA sex harassment, FEHA race harassment, FEHA sex discrimination, and FEHA race discrimination [Dkt. 76 at 2-3] is **GRANTED**.

4. Lain's motion for summary judgment [Dkt. 77] is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 26, 2025

_____

PETER H. KANG
United States Magistrate Judge

United States District Court
Northern District of California